Joseph R. Saveri (State Bar No. 130064)
Andrew M. Purdy (State Bar No. 261912)
Matthew S. Weiler (State Bar No. 236052)
James G. Dallal (State Bar No. 277826)
Ryan J. McEwan (State Bar No. 285595)
JOSEPH SAVERI LAW FIRM, INC.
555 Montgomery Street, Suite 1210
San Francisco, California 94111
Telephone:    (415) 500-6800
Facsimile:     (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                apurdy@saverilawfirm.com
                mweiler@saverilawfirm.com
                jdallal@saverilawfirm.com
                rmcewan@saverilawfirm.com

Solomon B. Cera (State Bar No. 99467)
C. Andrew Dirksen (State Bar No. 197378)
CERA LLP
595 Market Street, Suite 2300
San Francisco, California 94105
Telephone:    (415) 777-2230
Facsimile:     (415) 777-5189
Email:          scera@cerallp.com
                adirksen@cerallp.com

*Attorneys for Individual and Representative Plaintiff Chip-Tech, Ltd.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Chip Tech, Ltd,. On Behalf Of Itself and All Others Similarly Situated,<br><br>                   Plaintiff,<br><br>          v.<br><br>AVX Corporation; KEMET Corporation; KEMET Electronics Corporation; KOA Corporation; KOA Speer Electronics, Inc.; Panasonic Corporation, Panasonic Corporation of North America; Panasonic Electronic Devices Co. Ltd;  Panasonic Electronic Devices Corporation of America; ROHM Co., Ltd.; ROHM Semiconductor U.S.A. LLC; SANYO Electric Co., Ltd.; SANYO North America Corporation; TDK Corporation; TDK-EPC Corporation; TDK U.S.A. Corporation; Vishay Intertechnology, Inc.,<br><br>                   Defendants | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Chip-Tech, Ltd. ("Chip-Tech" or Plaintiff) brings this action on behalf of itself and on behalf of a class of all persons and entities similarly situated (the "Class" or the "Direct Purchaser Class"), for damages and injunctive relief under the antitrust laws of the United States against Defendants AVX Corporation; KEMET Corporation; KEMET Electronics Corporation; KOA Corporation; KOA Speer Electronics, Inc.; Panasonic Corporation, Panasonic Corporation of North America; Panasonic Electronic Devices Co. Ltd;  Panasonic Electronic Devices Corporation of America; ROHM Co., Ltd.; ROHM Semiconductor U.S.A. LLC; SANYO Electric Co., Ltd.; SANYO North America Corporation; TDK Corporation; TDK-EPC Corporation; TDK U.S.A. Corporation; and Vishay Intertechnology, Inc.; (collectively, the "Defendants"). Plaintiff alleges facts regarding itself based on its personal knowledge, and on information and belief as to all other factual allegations, as follows:

## I.       NATURE OF THE ACTION

1.      This civil antitrust class action seeks damages and injunctive relief for the collusive and concerted restraint of trade in Resistors (together, "Resistors") orchestrated by the Defendants—all of which are leading manufacturers and direct competitors in the global Resistors industry—at least as early as January 1, 2003 to present (the "Class Period").

2.      Resistors are an essential component of all electronic circuits. All electronic devices in common use today—from the cheapest household appliances to personal computers to multi-million dollar computerized machinery—employ various electrical circuits working in concert to perform their functions. By electrical current (*i.e.*, the aggregate effect of moving electrical charge) flowing through a circuit, the path for which is usually defined by a printed circuit board ("PCB"), electronic signals can be amplified, simple and complex computations can be performed, data can be moved from one place to another, and other tasks can be executed.

3.      Without the flow of electrical current, circuit boards—as well as the electronic devices that contain them—will not operate. Accordingly, circuits must not only have a source for current, but also means for storing and regulating the flow of that current.

4.      A resistor is a passive two-terminal electrical component that implements electrical resistance as a circuit element. Resistors act to reduce current flow, and, at the same time, act to lower

voltage levels within circuits. In electronic circuits, Resistors are used to limit current flow, to adjust signal levels, bias active elements, terminate transmission lines among other uses. High-power Resistors that can dissipate many watts of electrical power as heat may be used as part of motor controls, in power distribution systems, or as test loads for generators. Fixed Resistors have resistances that only change slightly with temperature, time or operating voltage. Variable Resistors can be used to adjust circuit elements (such as a volume control or a lamp dimmer), or as sensing devices for heat, light, humidity, force, or chemical activity.

5.      Resistors are integrated into electrical circuits to allow the energy traveling through a circuit to be manipulated. Resistors allow consumers to change the volume, or heat level, on electronic devices. Along with capacitors, Resistors constitute 80 to 90% of the mass of circuit boards used in electronic products such as computers.

6.      As society's dependence on and consumption of technology has grown, so too has the demand of electronic device manufacturers for Resistors. As they are ubiquitous to electronic circuits, Resistors are fundamental to the operation of practically all electronic devices  and thus the market for Resistors is enormous. Resistors are commodity products sold in large volumes. Indeed, global sales of Resistors in 2014 totaled approximately $4.5 billion. Industry analysts estimate that global revenues from the sale of Resistors will reach over $5 billion for the fiscal year 2015.

7.      Resistors are relatively inexpensive to purchase on a per unit basis. Most Resistors cost less than a penny per unit, and typically cost as low as a fraction of a cent. Accordingly, the cost of Resistors is usually only a relatively small (but notResistors insignificant) part of the overall cost of the products containing them.

8.      The multi-billion dollar market for Resistors is susceptible to anticompetitive manipulation, particularly by entities that regularly and habitually collude with one another. Given, as alleged in detail below, the significant high barriers to entering the already mature and consolidation-prone Resistors manufacturing industry and achieving the large volume of sales required to reach sufficient economies of scale and profitability on a per unit basis, global sales of Resistors are dominated by a limited number of large manufacturers. These would-be competitors—specifically the Defendants named herein—sell mutually interchangeable commoditized products and adjust the prices and market

CLASS ACTION COMPLAINT

availability of their products in concert and based on an overarching agreement to fix, raise, maintain, and/or stabilize prices as described in detail below. These facts indicate that competition between the global sellers of Resistors has been suppressed.

9.      Resistors can be designed as thick and thin film chips, as insulated carbon capsules, and in coils of metals such as nickel, chromium. Resistors of like design are generally mutually interchangeable. Price is therefore the chief differentiation among these products for purchasers. Accordingly, any agreement among Resistors manufacturers to fix, raise, maintain or stabilize prices, or to reduce the supply of Resistors, is highly likely to be effective in artificially inflating prices above those that would prevail in a competitive market to the detriment of purchasers both worldwide and in the United States.

10.      The threat of anticompetitive manipulation for the sales of Resistors is not a hypothetical concern. On information and belief, at least one Defendant is currently a target of investigation by the United States Department of Justice ("DOJ") for engaging in activities undertaken for the purpose of artificially maintaining and inflating prices of Resistors sold to United States purchasers and purchasers worldwide. Other Defendants have colluded with one another with respect to other passive electronic components they manufacture and distribute.

11.      Defendants committed these unlawful anticompetitive acts because: (1) prior to the outset of the conspiracy, competition was reducing margins on Resistors; (2) demand for certain types of Resistors began to wane starting in the early 2000s as devices such as televisions and computers became smaller and required less Resistors; (3) per-unit prices for Resistors dropped dramatically in the 2001 downturn and never recovered; (4) and the 2008 Great Recession provided further incentive to conspire to stabilize Resistors prices.

12.      To bolster the profitability of their respective resistor sales, and to slow and offset the impact on price caused by declining demand, Defendants agreed prior to the beginning of the Class Period to curtail price competition among themselves for their respective mutually interchangeable Resistors.

13.      Accordingly, at least as early as January 1, 2003, Defendants formed a cartel and conspired by directly and indirectly communicating with each other to implement and effectuate an

overarching scheme to control and set the prices of their Resistors sold to United States purchasers and purchasers worldwide. Defendants also agreed, as part of the cartel, to combine and perform the various acts necessary to achieve the anticompetitive purposes of this scheme, as well as to conceal their activity from public view and regulatory oversight.

14.    The Defendants' conspiracy was furthered and facilitated by a course of anticompetitive conduct and overt acts, such as making numerous agreements (both written and oral) and reaching understandings among themselves—at times developed during regular meetings among themselves throughout the Class Period—that they would in concert fix, raise, maintain and stabilize prices for Resistors.

15.    Defendants also agreed to restrain their respective resistor manufacturing output through extending product lead times and other subterfuge.

16.    As part of the conspiracy alleged herein, and to assist in achieving its ends, Defendants agreed to exchange and exchanged amongst themselves nonpublic and commercially sensitive information concerning, among other things, purchaser-specific Resistors pricing requests, current industry-specific Resistors pricing requests, current and future Resistors pricing intentions, timing of pricing changes, production capacity, costs, availability and cost of raw materials, product distribution, and other data that Defendants used to assist in the implementation and enforcement of their conspiracy.

17.    Defendants concealed their anticompetitive and unlawful conduct from the public and their customers, including Plaintiffs and the Direct Purchaser Class, from the inception of the conspiracy until the summer of 2015, when Defendant Panasonic Corporation acknowledged that it was seeking leniency from the DOJ for price-fixing related to Resistors.

18.    Defendants' cartel has been successful in achieving the anticompetitive and unlawful ends for which it was formed. Through their concerted actions, Defendants—the dominant players in the global and U.S. markets for Resistors—fixed, raised, maintained and/or stabilized prices of Resistors during the entirety of the time that the Defendants' conspiracy has existed. Defendants were effective in moderating, negating and reversing the normal competitive pressures on prices for Resistors caused by price competition, reduction of demand, technological change and oversupply.

CLASS ACTION COMPLAINT

19.     Defendants' anticompetitive and unlawful conduct proximately caused the increase or slowed the decrease of prices for Resistors sold to United States and worldwide purchasers during the Class Period.

20.     As a result, Plaintiffs and the Direct Purchaser Class paid artificially inflated prices for Resistors. By paying higher prices for Resistors than those that would have prevailed in a competitive market, Plaintiffs and the Direct Purchaser Class have been injured in their business and property and continue to suffer such injuries as a direct and proximate result of Defendants' actions.

## II.     JURISDICTION AND VENUE

21.     Plaintiff brings this action on behalf of itself, as well as on behalf of the Direct Purchaser Class, to recover damages, including treble damages, costs of suit, and reasonable attorney's fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1), as well as any and all equitable relief afforded them under the federal laws pleaded herein.

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

23.     Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District, is licensed to do business in this District, and/or transacts business in this District.

24.     In addition, the DOJ's Antitrust Division is conducting an investigation into the Resistors industry. On information and belief, this investigation arose out of the United States Attorney's Office for the Northern District of California's investigation into the capacitors industry. In the capacitors investigation, a federal criminal grand jury has been empaneled in the Northern District of California to hear the DOJ's evidence derived from its investigation and ultimately to decide on whether to indict any capacitors manufacturers.

25.     Pursuant to Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws

action was substantially conducted with, directed to or impacted Plaintiffs and members of the Direct Purchaser Class in counties located within the Division.

III. PARTIES

**A. Plaintiff**

26. Plaintiff Chip-Tech, Ltd. is a New York corporation with its principal place of business located at 6 Dubon Court, Farmingdale, New York 11735. Chip-Tech directly purchased Resistors from one or more Defendant during the Class Period, and has suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

**B. Defendants**

**1. AVX**

27. Defendant AVX Corporation ("AVX") is a Delaware corporation with its principal place of business located at One AVX Boulevard, Fountain Inn, South Carolina 29644. It is a subsidiary of non-party Kyocera Corporation, a Japanese corporation that owns approximately 72% of AVX's outstanding common stock. During the Class Period, AVX manufactured, sold, and Resistors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

**2. KEMET**

28. Defendant KEMET Corporation ("KEMET Corp.") is a Delaware corporation with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. During the Class Period, KEMET Corp. manufactured, sold and distributed Resistors either directly or through its business units, subsidiaries, agents or affiliates—including, without limitation, KEMET Electronics Corporation—to purchasers throughout the United States.

29. Defendant KEMET Electronics Corporation ("KEC"), a Delaware corporation, is a wholly owned subsidiary of KEMET Corp. with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. During the Class Period, KEC—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to purchasers throughout the United States Resistors manufactured by certain of its own business units, subsidiaries, agents or affiliates or those of its corporate parent, KEMET Corp.

CLASS ACTION COMPLAINT

30.     KEMET Corp. is the holding company of KEC and, accordingly, has no business of its own. KEC is the alter ego of KEMET Corp. Although separate corporate entities, KEMET Corp. and KEC are functionally a single economic and operational entity.

**3.     KOA**

31.     Defendant KOA Corporation ("KOA") is a Japanese corporation with its principal place of business located at 2-17-2 Midori-Cho, Fuchu-Shi, Tokyo 183-0006, Japan. KOA is one of the world's leading manufacturers of Resistors, and the largest manufacturer of thick film chip Resistors used in automobiles . During the Class Period, KOA manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

32.     Defendant KOA Speer Electronics, Inc. ("KOA Speer") is a Delaware corporation with its principal place of business located at 199 Bolivar Drive, Bradford, Pennsylvania 16701. KOA Speer is one of the world's leading manufacturers of Resistors and is a wholly owned subsidiary of KOA (Collectively, the "KOA Defendants"). During the Class Period, KOA Speer manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

**4.     Panasonic**

33.     Defendant Panasonic Corporation is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Until October 1, 2008, Panasonic Corporation operated under the name of Matsushita Electric Industrial Co., Ltd. ("Matsushita"). During the Class Period, Matsushita and Panasonic (together, "Panasonic Corp.") manufactured, sold and distributed Resistors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

34.     Defendant Panasonic Corporation of North America ("PCNA"), a wholly owned subsidiary of Panasonic Corporation, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102. During the Class Period, PCNA—either directly or through its business units, subsidiaries, agents or affiliates (including, without limitation, Panasonic Industrial Sales Company)—sold and distributed to United States purchasers Resistors

manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Panasonic Corporation.

35.    Defendant SANYO Electric Co., Ltd. ("SANYO Co."), a Japanese corporation, is, as of December 2009, a wholly owned subsidiary of Panasonic Corporation, with its principal place of business located at 15-5, Keihan-Hondori, 2-Chome, Moriguchi City, Osaka 570-8677, Japan. During the Class Period, SANYO Co. manufactured, sold and distributed Resistors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers. Prior to its acquisition by Panasonic in December 2009, SANYO had no corporate affiliation with Panasonic Corporation or its business units, subsidiaries, agents or affiliates.

36.    Defendant Panasonic Electronic Devices Co. Ltd ("PED"), a Japanese corporation, is a wholly owned subsidiary of Panasonic Corporation. During part of the Class Period, PED had its headquarters at 1006, Oaza Kadoma, Kadoma City, Osaka, Japan. Defendant Panasonic Industrial Devices Sales Company of America ("PIDS")  is a wholly owned subsidiary of Panasonic, and a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102. PED and PIDS are the third largest manufacturer of linear Resistors. In August 2011, PED and was absorbed into Panasonic Corporation. See

http://news.panasonic.com/press/news/official.data/data.dir/en110831-6/en110831-6.html.

37.    Defendant SANYO North America Corporation ("SANYO NA"), a Delaware corporation, is a wholly owned subsidiary of SANYO Co., with its principal place of business located at 2055 Sanyo Avenue, San Diego, California 92154. During the Class Period, SANYO NA—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers Resistors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, SANYO Co.

38.    Defendants Panasonic Corp., PCNA, PIDS, SANYO Co. and SANYO NA are together referred to herein as "Panasonic."

**5.    ROHM**

39.    Defendant ROHM Co., Ltd. ("ROHM Co.") is a Japanese corporation with its principal place of business located at 21 Saiin Mizosaki-cho, Ukyo-ku, Kyoto 615-8585, Japan. During the Class

Period, ROHM manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

40.     Defendant ROHM Semiconductor U.S.A., LLC ("ROHM USA"), a Delaware limited liability corporation, is a subsidiary of ROHM Co. with its principal place of business located at 2323 Owen Street, Suite 150, Santa Clara, California 95054. During the Class Period, ROHM USA— either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers Resistors manufactured by certain business units, subsidiaries, agents or affiliates of its corporate parent, ROHM Co.

41.     Defendants ROHM Co. and ROHM USA are together referred to herein as "ROHM."

**6.     TDK**

42.     Defendant TDK Corporation is a Japanese corporation with its corporate headquarters located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo, Japan.  During the Class Period, TDK Corporation manufactured, sold distributed Resistors either directly or through its subsidiaries, agents or affiliates to purchasers throughout the United States.

43.     TDK-EPC Corporation, a Japanese corporation, is a wholly owned subsidiary of TDK Corporation with its principal place of business located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo, Japan.  TDK-EPC Corporation was founded on October 1, 2009 from the combination of the passive components business of TDK and EPCOS AG.  During the Class Period, TDK-EPC Corporation manufactured, sold and distributed Resistors either directly or through its subsidiaries, agents or affiliates to purchasers throughout the United States.

44.     Defendant TDK U.S.A. Corporation, a New York corporation, is a wholly owned subsidiary of TDK Corporation with its principal place of business located at 525 RXR Plaza, Uniondale, New York 11556.  During the Class Period, TDK U.S.A. Corporation manufactured, sold and distributed Resistors either directly or through its subsidiaries, agents or affiliates to purchasers throughout the United States.

45.     Defendants TDK Corporation, TDK-EPC Corporation, and TDK U.S.A. Corporation are referred to collectively herein as "TDK." TDK is the largest manufacturers of non-linear Resistors.

**7.    Vishay**

46.    Defendant Vishay Intertechnology, Inc. ("Vishay") is a Delaware corporation with its principal place of business located at 63 Lancaster Avenue, Malvern, Pennsylvania 19355. Vishay is one of the world's leading manufacturers of Resistors, especially wirewound, nichrome, tin oxide and thin film Resistors. Indeed, Vishay is the largest manufacturer of linear Resistors in the world. During the Class Period, Vishay manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

## IV.    CO-CONSPIRATORS AND AGENTS

47.    The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by Defendants and their respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

48.    Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

49.    Each Defendant acted as the principal, agent or joint venturer of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein. In particular and as alleged more fully below, each Defendant headquartered outside the United States relied on their agents in the United States (be they wholly owned subsidiaries or otherwise) to implement, enforce and conceal the cartel in the United States as part of their respective global sales and marketing systems. Defendants' subsidiaries were aware of an agreement to keep prices for Resistors high, and they sold, or distributed, Resistors to customers in the United States; the subsidiaries charged supracompetitive cartel prices as set by their foreign parents; the subsidiaries assisted their parents in concocting and disseminating pretexts for price increases; and in many instances the subsidiaries communicated with cartel members individually to help implement and conceal the price-fixing scheme. Persons who attended cartel meetings or participated in cartel activities did so representing the corporate enterprise on whose behalf their attended. Other participants also did so and understood they and others attended

as representatives of their respective enterprises and further understood they were making global agreements on behalf of corporate enterprises they represented.

50.     The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed between the Defendant principals and agents. Defendants' agents acted in the United States and abroad within the scope of their agency relationship with their own principals. Defendants' agents acted under the explicit authority, implied authority or apparent authority of their principals. These acts include, but are not limited to, subsidiaries selling, distributing, or shipping Resistors at the request of their parent companies. Further, Defendants acted on behalf of and were subject to the control of their principals, and they acted within the scope of authority or power delegated by their principals. Defendants' agents performed their duties with appropriate care and diligence, within the scope of their agency, in selling, distributing, or shipping Resistors that had been sold at supracompetitive prices.

51.     Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied or apparent authority.

# V.     CLASS ALLEGATIONS

52.     Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of the members of a Class, which is defined as follows:

> All persons in the United States that purchased Resistors (including through controlled subsidiaries, agents, affiliates or joint-ventures) directly from any of the Defendants, their subsidiaries, agents, affiliates or joint ventures from January 1, 2003 through the present (the "Class Period").

53.     The Direct Purchaser Class definition encompasses those who purchased Resistors directly from any of the Defendants, even if the Resistors purchased were manufactured, sold or distributed by a given Defendant's predecessors, parents, business units, subsidiaries, affiliated entities, principals, agents or co-conspirators.

54.     This definition of the Direct Purchaser Class specifically excludes the following persons or entities:

a. Any of the Defendants named herein;

b. Any of the Defendants' co-conspirators;

c. Any of Defendants' parent companies and their subsidiaries, agents or affiliates;

d. Any of Defendants' officers, directors, management, employees, subsidiaries, agents or affiliates;

e. All governmental entities; and

f. The judges and chambers staff in this case, as well as any members of their immediate families.

55. Plaintiff does not know the exact number of Direct Purchaser Class members, because such information is in the exclusive control of Defendants. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, there are thousands of Direct Purchaser Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

56. Plaintiff's claims are typical of the claims of its fellow Class members because Plaintiff directly purchased Resistors from certain of the Defendants named herein, Plaintiff and all Direct Purchaser Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

57. Numerous questions of law or fact common to the entire Direct Purchaser Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a. Whether Defendants combined and/or conspired to fix, raise, maintain, or stabilize prices of Resistors sold to purchasers in the United States at any time during the Class Period;

b. Whether Defendants concertedly fixed, raised, maintained or stabilized prices of Resistors sold to purchasers in the United States at any time during the Class Period, or committed other conduct in furtherance of the conspiracy alleged herein;

c. The duration and the extent of Defendants' conspiracy;

CLASS ACTION COMPLAINT

d.   Whether Defendant fraudulently concealed their conspiracy from Resistors purchasers in the United States;

e.   Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act;

f.   Whether Defendants' conduct caused the prices of Resistors sold at any time during the Class Period to purchasers in the United States to be artificially fixed, raised, maintained or stabilized at noncompetitive prices;

g.   Whether Plaintiff and the other members of the Direct Purchaser Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages; and

h.   Whether Plaintiffs and other members of the Direct Purchaser Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

58.   These and other questions of law and fact are common to the Direct Purchaser Class and predominate over any questions affecting the Class members individually.

59.   Plaintiff will fairly and adequately represent the interests of the Direct Purchaser Class because they directly purchased Resistors from one or more Defendants and they have no conflicts with any other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation.

60.   Defendants have acted on grounds generally applicable to the Direct Purchaser Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

61.   This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution of the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

62.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI. TRADE AND COMMERCE

63.     During the Class Period, each Defendant, directly or through one or more of its respective parents, subsidiaries, business units, agents or affiliates, sold or delivered to United States purchasers Resistors in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

64.     By way of example and not limitation, and as detailed more fully below, the following Defendants each assisted their respective corporate parent Defendants with the sale or delivery to United States purchasers of the parents' respective Resistors United States purchasers: PCNA; SANYO NA; PEDCA; UCC; KOA Speer; ROHM USA; TDK USA.

65.     During the Class Period, Defendants collectively controlled the respective markets for the sale of Resistors, both globally and also in the United States.

66.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

67.     Resistors manufactured abroad by the Defendants and sold in the United States constitute domestic or import commerce.

68.     To the extent any Resistors have been or purchased by Direct Purchaser Class members and these purchases do not constitute domestic or import commerce, the Defendants' unlawful activities with respect thereto, as more fully alleged herein, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce that gives rise to the claims asserted herein.

69.     Defendants also sold Resistors overseas directly to members of the Direct Purchaser Class (including through the Class members' controlled subsidiaries, agents or affiliates), some of which were incorporated into products manufactured overseas that were imported into the United States. These sales by Defendants involved import commerce and had a substantial, direct and reasonable foreseeable effect on United States import commerce that gives rise to the claims asserted herein.

70. By reason of the unlawful activities hereinafter alleged, Defendants substantially and foreseeably affected commerce throughout the United States, causing injury to Plaintiff and members of the Direct Purchaser Class. Defendants, directly and through their respective parents, subsidiaries, business units, agents, affiliates, successors and predecessors knowingly and intentionally engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices in the United States for Resistors, which conspiracy unreasonably restrained trade and artificially inflated the prices for Resistors and manufactured products incorporating Resistors imported into the United States.

71. The anticompetitive conduct described herein, and its effect on United States commerce, proximately caused antitrust injury to Plaintiffs and members of the Direct Purchaser Class in the United States and gives rise to their claims. The anticompetitive conduct caused Plaintiffs and members of the Direct Purchaser Class to pay supra-competitive prices for Resistors. The anticompetitive conduct also caused persons in the United States to pay supra-competitive prices for manufactured products imported by members of the Direct Purchaser Class that incorporate Resistors purchased from the Defendants. In each of these categories, the resulting price increases amounted to hundreds of millions of dollars or more and should have been or were, in fact, anticipated by Defendants, as they are the natural and predictable consequence of Defendants' anticompetitive conduct.

## VII. FACTUAL ALLEGATIONS

### A. What Resistors Do and How They Work

72. Resistors are electronic components that serve as one of the fundamental building blocks of all types of electrical circuits. Resistors are ubiquitous in electric devices such as computers, tablets, televisions, radios, and stereos. Virtually every electrical circuit contains one or more Resistors. In the taxonomy of electrical components, Resistors are categorized as "passive" components. That is, Resistors do not require electrical power to operate. Instead, the physical properties of the materials that compose a passive component cause it to perform the task for which it is employed.

73. Generally, a resistor is an electrical component that limits or regulates the flow of electrical current in an electronic circuit. Electronic devices such as televisions, computers, and automobiles use hundreds of Resistors of various types. The most commonly used Resistors in such

devices are thick chip Resistors made of film; axially and radially arranged leaded Resistors in nichrome, wirewound or using tin oxide resistive elements; carbon film Resistors; in-line thick film networks made of nichrome or tantalum nitride; and chrome silicide thin film Resistors.

74.     The overall resistor market is sub-divided into linear and non-linear Resistors. Linear Resistors are those in which current produced is directly proportional to the applied voltage. These Resistors are "linear" in because comparing current versus applied voltage yields a straight and linear relationship. Non-Linear Resistors are those whose current does not change linearly—or in a constant fashion—with changes in applied voltage. It is so because the current flow always results in production of heat, which either increases (as in metals) or decreases their resistance (as in insulators). Because of this change in resistance the current through such a resistor is not directly proportional to the impressed voltage.

75.     Linear Resistors are most commonly used in consumer audio and video devices and computers. Non-linear Resistors are most commonly used in larger circuits, such as in telecommunications and automobiles. Both linear and non-linear Resistors are manufactured using similar metals and materials, and many Defendants manufacture both linear and non-linear Resistors.

**B.     The Market Conditions in Which Defendants' Conspiracy Originated and Operated**

76.     Generally, there are three principal types of Direct Purchasers of Resistors, including: (1) OEMs who incorporate Resistors into their finished products, (2) manufacturers who create or assemble PCBs and other electric circuit products containing Resistors that ultimately are incorporated into finished products manufactured by OEMs and other product manufacturers, and (3) electronic component distributors who buy Resistors directly from manufacturers and resell them.

77.     According to a leading industry analyst,[1] the North and South American markets for Resistors collectively account for approximately $1.021 billion for fiscal year 2014, or roughly 23 percent of the global market.

78.     Though Resistors are used in all types of electrical circuits, the demand for all types of Resistors for at least the last decade has been largely tied to the demand for consumer electronics. After

---
[1] Dennis M. Zogbi, CEO and Founder of Paumanok Publications, Inc.

experiencing growth throughout most of the 1990s and early years of the 2000s, resistor demand dropped dramatically in 2001, and again during the Great Recession of 2008. Despite the drop in demand, prices for Resistors have remained remarkably consistent throughout the Class Period. For example, although the average price for Resistors dropped from around $0.0080 per unit to around $0.0045 per unit from 2001 to 2002, prices for Resistors remained remarkable constant from 2002 to 2004, remaining around $0.0045. *A Market Research Analysis Covering World Markets, Technologies & Opportunities Linear and Non-Linear Resistors: 2004-2008* (Paumanok Publications, Inc. May 2004). Indeed, the 2008 Recession had only a mild impact on the average price of Resistors, in comparison to the much less severe 2001 global downturn, in which prices for Resistors fell nearly in half:

| LINEAR RESISTORS | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013f | 2014e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chip Resistors | $0.996 | $0.960 | $0.944 | $0.949 | $0.916 | $0.877 | $0.781 | $0.731 | $0.740 | $0.725 | $0.711 | $0.699 |
| Networks, Arrays &IPD | $45.000 | $41.867 | $39.750 | $34.800 | $32.069 | $28.485 | $26.897 | $26.333 | $26.485 | $27.065 | $25.156 | $25.794 |
| Film/Oxide/Foil | $35.000 | $31.412 | $31.333 | $30.101 | $29.902 | $29.238 | $27.677 | $26.421 | $27.250 | $28.636 | $28.182 | $27.583 |
| Wirewound | $284.615 | $278.571 | $273.333 | $258.824 | $250.556 | $252.778 | $232.571 | $224.096 | $242.500 | $244.737 | $242.222 | $241.000 |
| Carbon Film/Comp | $5.143 | $4.471 | $4.111 | $4.118 | $3.941 | $3.750 | $3.857 | $3.769 | $4.923 | $4.909 | $4.800 | $4.727 |
| Total Linear Resistors | $2.517 | $2.451 | $2.542 | $2.509 | $2.347 | $2.215 | $2.067 | $1.921 | $2.017 | $2.015 | $1.967 | $1.946 |
| NON-LINEAR RESISTORS | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014f |
| Metal Oxide Varistors | $35.4281 | $34.0769 | $32.9889 | $31.0000 | $30.2927 | $30.0000 | $29.0003 | $30.0457 | $29.0004 | $28.0000 | $26.3279 | $25.5783 |
| PTC Thermistors | $126.3393 | $118.0039 | $113.5338 | $110.8108 | $106.6777 | $103.3846 | $104.4534 | $104.1296 | $103.7963 | $101.5561 | $99.8322 | $97.6805 |
| NTC Thermistors | $156.8182 | $162.2318 | $161.4173 | $159.0909 | $157.9805 | $156.8750 | $158.0247 | $157.4830 | $156.4388 | $154.1463 | $151.9873 | $149.9264 |
| Total Non-Linear Resistors | $73.613 | $69.667 | $68.239 | $62.849 | $59.153 | $57.855 | $56.424 | $56.876 | $55.266 | $53.416 | $48.630 | $47.077 |
| Grand Total Resistors | $ 4.0825 | $ 3.9665 | $ 3.9921 | $ 3.9429 | $ 3.7294 | $ 3.5635 | $ 3.2300 | $ 3.3876 | $ 3.3458 | $ 3.3184 | $ 3.3303 | $ 3.2368 |

[Source: Resistors 2014 World Markets, Technologies & Opportunities: 2014-2019 (Paumanok Publications, Inc. September 2014)].

## C. Defendants' Collusive Anticompetitive Practices

79.     Faced with increased requests by purchasers for price reductions and an overall decline in demand for their Resistors, before and during the Class Period, Defendants knew that price competition would reduce, if not eliminate, profitability for Defendants' resistor manufacturing operations.

80.     Before and during the Class Period, Defendants were aware that fringe non-party resistor manufacturers with smaller market shares markets faced capacity, technology, and resources constraints that would render them unable to successfully compete against Defendants by meeting and/or capturing market demand for Resistors should Defendants artificially control prices in these three product markets.

81.     Resistors of the same resistance are, in most instances, mutually interchangeable for each other.

CLASS ACTION COMPLAINT

82. Before and during the Class Period, Defendants were aware of the interchangeability of their respective Resistors having similar reistance, and had concerns that purchasers' understanding of this interchangeability could drive Defendants to compete against themselves on price for sales.

83. Resistors are components fundamentally necessary for the function of electric circuits. Other types of passive electrical components (*e.g.*, inductors, capacitors) cannot serve as a substitute for or a functional equivalent to a resistor.

84. Before and during the Class Period, Defendants were aware of their customers' inability to substitute other passive electronic components to take the place of the Resistors they required. This fact emboldened Defendants to set prices for their Resistors collusively during the Class Period because, without any feasible substitutes for Resistors on the market, Defendants would not lose anything close to sufficient sales to make the cartel pricing unprofitable.

85. All types of Resistors purchasers—OEMs, CMs and third-party distributors—are almost always committed to inflexible production or delivery deadlines to their respective customers, and therefore are likely to accept collusively set price increases on the Resistors they require to avoid the usually greater cost of production delays or customer dissatisfaction.

86. Before and during the Class Period, Defendants were aware that, because Resistors are necessary, non-substitutable, and generally inexpensive, collusively set price increases would face little to no opposition from purchasers.

87. In their collective and individual consideration of these market conditions and product characteristics, Defendants agreed to operate as a cartel to suppress price competition among them for their respective competing Resistors manufacturers. This agreement was reached through both oral and written communications among directors, executives, officers, business unit managers, sales representatives and employees of the Defendant companies. These communications occurred in person through both regular and impromptu meetings, electronic or paper correspondence, text messaging and/or telephonic or video communications in the period before and during the Class Period.

**D.    Defendants' Cartel**

88. Rather than engage in competition, Defendants colluded, formed a cartel, and agreed to fix, raise, and stabilize resistor prices throughout the world, including in the United States.

89. Defendants intended to restrain trade in Resistors through trade associations and meetings of trade associations. One group that, on information and belief, was the ████████ ████████████████████ meetings included personnel from, at least, AVX, Panasonic, Vishay, KEMET, TDK, and KOA.

90. Defendants also met as part of the Passive Components Market Services ("PCMS"). At these meetings, Defendants exchanged information concerning capacitors, Resistors, and other passive components. PCMS meetings happened regularly during the Class Period, and were held in the United States. For example, a PCMS meeting occurred in Chicago in January 2008.

91. ████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

92. Finally, Defendants KOA, Panasonic, ROHM, and Vishay met as part of the America Corporation Electronic Components Industry Association ("ECIA"), which is located in Alpharetta, Georgia. PCMS meetings were organized by ECIA members, and PCMS was a subgroup of ECIA.

## VIII. INDUSTRY CHARACTERISTICS INDICATING AND FACILITATING DEFENDANTS' CONSPIRACY

93. For at least as long as the Class Period, the Resistors industry has been characterized by numerous factors that facilitated Defendants' conspiracy. By way of illustration and not limitation, the industry has exhibited (1) market concentration among a limited number of participants; (2) high barriers to entry; (3) mutual interchangeability of Defendants' products; (4) inelasticity of demand; (5) product commoditization; (6) weak demand in a mature market; (7) excess manufacturing capabilities and capacity; (8) a large number of purchasers with limited purchasing power; and (9) ease of information sharing among Defendants.

**A.      Market Concentration**

94.      Before and during the Class Period, Defendants—both individually and collectively—held significant shares in already-mature markets for Resistors, thereby producing a significant amount of the Resistors available to United States purchasers and purchasers worldwide. Indeed, the market for Resistors was highly concentrated throughout the Class Period. In 2003, Panasonic, Vishay, KOA, and Rohm held 61% of the market for linear Resistors; at that same time, Defendants had nearly 40% of the market for non-linear Resistors. In 2014, Defendants had nearly 40% of the world market for all types of Resistors.

95.      Global sales for Resistors remain large. In 2014, linear Resistors were estimated to be a $2.65 billion industry, and non-linear Resistors are predicted to account for $1.89 billion.

**B.      High Barriers to Entry**

96.      In industries characterized by substantial barriers to entry, new entrants are unlikely to be able to compete away supracompetitive cartel pricing. Here, high barriers to entry have prevented entry by sellers of Resistors despite the artificial inflation of prices.

97.      Companies seeking to manufacture and sell Resistors confront various significant barriers to entry.

98.      The Resistors manufacturing industry is a mature one dominated by established corporations, most having multinational operations, global market reach, and diverse product portfolios of all types of passive electrical components. These companies—the Defendants in particular—have significant experience in the global Resistors industry and established reputations with both sellers of raw materials and purchasers of finished Resistors. These companies typically have access to significant financial resources that allow them to commit the capital necessary to bring online new fabrication operations and facilities or to expand/retrofit existing ones to meet and exceed market demand and adjust to technological changes. This readily available access to capital also permits manufacturers like Defendants the ability to establish and secure necessary supply chain commitments for all raw materials they require. Defendants are all established manufacturers in the Resistors industry.

99.      For a prospective resistor manufacturer, setting up competitive manufacturing operations and supply chain operations is a significant financial and logistic hurdle to market entry. A

CLASS ACTION COMPLAINT

new entrant seeking to build Resistors operations and facilities faces not only the sizeable cost of building fabrication plants, but also the costs of acquiring the necessary production technology, hiring and retaining skilled and knowledgeable manpower, and securing the raw materials and supply chain commitments necessary to manufacture competitive products. These costs would exceed hundreds of millions of dollars. Many of the Defendant manufacturers have developed internal processing capabilities for raw materials and have established relationships with raw materials producers that all but insure that their requirements will be met.

100.    Moreover, some of the raw materials necessary to manufacture certain types of Resistors are produced in only a limited number of regions around the world or are available from only a limited number of suppliers. Many Resistors are made with rare earth metals, which are of limited supply, and which require expensive mining and processing.

101.    For example, thin film Resistors are made with tantalum nitride, a substance that uses the rare metal tantalum. Tantalum is only mined in a few regions in the world, principally South America (Brazil), central Africa (the Democratic Republic of Congo), and Australia. Because the Congo is rich in ores containing tantalum, rebel factions in the country have mined and sold tantalum to foreigners in order to fund their insurgency. To avoid SEC-reporting companies directly or indirectly funding civil wars and strife abroad when purchasing their tantalum requirements, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 1502, which designates tantalum as a "conflict mineral" and requires that public companies using tantalum or other conflict minerals to file annual public reports with the SEC regarding the origins of conflict minerals in their supply chains that disclose and represent the source of these minerals. Sourcing concerns led to supply shortages and price shocks. Accordingly, a potential new thin film resistor manufacturer not only would have difficulty securing adequate supplies of tantalum in the already competitive global market for the mineral, but would likely have to commit significant time, effort and money to auditing its newly acquired tantalum supply chain.

102.    Similarly, other rare metals and materials used by resistor manufacturers include ruthenium, nickel, Tin and alumina. Ruthenium is the primary precious metal consumed in thick film chips, networks and arrays; while nickel is used in wirewound and nichrome Resistors.

103.     These hurdles, however, are not the only barriers a new market entrant faces. For a new market entrant consistently to manufacture and sell Resistors competitively and to create and sustain a diverse product portfolio, it must invest in substantial research and development operations. Additionally, the new entrant must create and maintain global sales, marketing and distribution operations so that its products can reach resistor purchasers.

104.     Ultimately, to be competitive, a new market entrant has to commit to significant financial and operational undertakings to establish itself in an industry where—absent price manipulation— profit margins are not large (and are trending lower) and large economies of scale must be achieved in order to reach profitability. A new market entrant seeking financing would need to convince investors or commercial lenders to loan it hundreds of millions of dollars to enter a market for commoditized, low profit margin products where profitability depends on achieving large economies of scale despite waning demand.

## C.     Interchangeability of Defendants' Resistors

105.     As noted earlier, Resistors of like resistance are interchangeable. A specific linear or non-linear resistor manufactured by one of the Defendants therefore can be exchanged for a product of another Defendant with the same technical and operational specifications. There are no other defining physical characteristics that differentiate Defendants' various Resistors from each other.

106.     Defendants are aware of the fungibility of their respective products. Indeed, Defendants have made product cross-reference materials available through their respective web sites, product catalogs, and/or other materials distributed to resistor purchasers. These cross-reference materials identify a specific competitor's Resistors by either product number or technical and operational specifications, and then identify their own specific interchangeable Resistors.

107.     Because resistor purchasers are aware of the interchangeability of Defendants' respective Resistors of like resistance, along with the possibility that certain products that are not directly fungible (*i.e.*, with differing technical tolerances and ratings) can still replace each other, Defendants present purchasers a broad portfolio of product choices that can meet their needs. Accordingly, absent Defendants' conspiracy, price would be the primary means of competition among Defendants in resistor markets.

### D. Inelastic Demand

108. Inelastic demand means that increases in price result in limited declines in quantity sold in the market. For a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices such that cartel members are able to raise prices without triggering a decline in sales revenue that would make the artificial price increase unprofitable. In simple terms, demand is inelastic when the loss in volume arising from a price increase is small relative to the magnitude of the increase in price, allowing higher prices to increase revenues and profits despite loss of sales.

109. Demand is inelastic for Resistors. When there are few or no substitutes for a product, purchasers have little choice but to pay higher prices in order to purchase these products. As set forth above, Resistors are a fundamental and necessary component in the electric circuits employed to make functional a wide variety of products within different end-markets. Resistors perform a particular function that generally cannot be replicated through inclusion of other components. No other type of passive electrical component (*e.g.*, inductors, capacitors) can serve as a substitute or a functional equivalent to a resistor in an electric circuit. Accordingly, a purchaser that is either an OEM or an EMS Provider cannot design an electric circuit to bypass its need for a resistor with a certain capacitance, dielectric and form factor.

110. Resistors are also often a comparatively inexpensive cost input in electrical devices, so a purchaser facing higher prices for Resistors would generally pay that increased price rather than forgo its opportunity to sell the device that includes the Resistors. Notably, Resistors bought for import to the United States are often ultimately used in the production of high-cost durable products such as cars, large electronic devices (such as televisions), and computers. Accordingly, U.S. resistor purchasers are generally less price-sensitive than Asian purchasers and will pay higher prices for Resistors in order to sell their final products or (for distributors) to meet demand.

111. Further, Resistors purchasers facing strict deadlines tied to promised product delivery dates would pay the increased price for the specific Resistors needed rather than lose out on the amount already invested in the completed products incorporating the Resistors or risk losing business permanently by alienating downstream customers through missed deadlines.

112.     Indeed, demand inelasticity for Resistors is particularly acute when a given electric circuit or an electronic device requires not just a resistor, but one with a specific resistance that specifically fits the circuit's design. In that instance, a purchaser has no choice but to buy a specific resistor with the required technical and operational characteristics.

**E.     Commoditization**

113.     When a product is characterized as a commodity, market participants typically compete on the basis of price rather than other attributes such as product quality or customer service. Where competition occurs principally on the basis of price, it is easier to implement and monitor a cartel because price is more often objectively measurable and observable than non-price factors such as service.

114.     Resistors are mass-produced through standardized manufacturing processes. They are designed according to standardized technical and operational characteristics for the various mutually interchangeable models Defendants manufacture.

115.     The Resistors at the center of Defendants' conspiracy are largely commoditized.

**F.     Weak Demand**

116.     Static or declining demand is one factor that makes the formation of a collusive arrangement more likely. Under normal business conditions, when faced with weak demand conditions, firms will attempt to maintain their sales by taking market share from competitors through decreasing prices. For this reason, firms faced with static or declining demand have a greater incentive to collude with competitors to avoid price competition and profit erosion.

117.     The overall demand for Resistors has declined since the early 2000s. Specifically, demand for Resistors is closely tied to the demand for particular consumer electronics, such as computers, televisions, and automobiles. Over the past decade, declining sales of desktop computers and television sets have weakened demand for passive electronic components, including Resistors. In 2012, for example, sales of televisions and desktop computers declined roughly 10% from the previous year, whereas demand for laptop computers declined only 2%. Weakened demand is also due to the smaller design of consumer electronic devices, such as televisions and computers, which now require fewer Resistors to manufacture.

**G.     Excess Manufacturing Capacity**

118.    All things equal, if product manufacturers have excess capacity available to meet and exceed demand, prices in an unfettered market will decline. This is all the more so if demand is falling as well.

119.    An economist would expect that in a market in which product manufacturers have excess production capacity and demand is falling, prices would fall as well. If those conditions exist, and yet prices are increasing, economics suggest that cartel behavior could be the cause of his anomaly.

120.    Before and during the Class Period, Defendants had excess manufacturing capacity that allowed them to expand to meet global and U.S. demand for Resistors. This excess capacity put downward pressure on prices, and resulted in the incentive to collude.

121.    In 2001, for example, industry statistics show that new unit shipments of chip Resistors dropped by 44% to 349 billion pieces, from the elevated levels of 625 billion pieces in 2000 due to excess inventories. Prices for Resistors fell nearly by half as a result.

**H.     Large Number of Purchasers With Limited Purchasing Power**

122.    In the markets for Resistors, Defendants each have historically sold and currently sell to a wide number of purchasers around the globe, the vast majority of whom during the Class Period made up a small part Defendant's respective annual net sales, year over year.

123.    Defendants therefore had many reasons during the Class Period to coordinate pricing and market supply availability with each other within the auspices of their cartel.

124.    Defendants concertedly priced their respective Resistors during the Class Period, and also provided lockstep quotation of production lead times to purchasers who tried to shop around for the best deal.

**I.     Ease of Information Sharing Among Defendants**

125.    Because of their common membership and participation in trade associations and interrelated business relationships between certain executives, officers, and employees of the Defendants, there were many opportunities both before and during the Class Period for Defendants to collude by discussing competitive information regarding their Resistors. The ease of communication was facilitated by the use of meetings, telephone conversations, email messages, written correspondence

and text messaging. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for the various types of Resistors they produce.

126.     Industry trade associations make a market more susceptible to collusive behavior because they can provide a pretext under which conspirators can exchange sensitive company information such as pricing and market allocation.

127.     A number of industry trade associations exist to which many of the Defendant manufacturers belong. The Japan Electronics and Information Technology Industries Association ("JEITA") is a prominent trade organization that claims as members many of the Defendants, *e.g.*, Panasonic and ROHM. It was formed in 2000 from two earlier organizations, the Electronic Industries Association of Japan and the Japan Electronic Industries Development Association.

128.     JEITA is not the only industry trade association to which Defendants hold memberships. As alleged above, Defendants were members of ███ PCMS, and ECIA. ███████████ ████████████████████ and Defendants worked with consultants in compiling data for both Resistors and Resistors at PCMS meetings.

129.     Aside from these formalized means of exchanging information among each other, Defendants have among them numerous informal links between their former and current colleagues, co-venturers, or partners employed by other Defendant companies as well as contemporaneous experience colluding with one another. These links provided them the means and opportunity to exchange competitively sensitive information. Despite the billions of dollars of revenue generated by the Resistors industry worldwide, it is still a narrow segment of the overall electronic components industry, and the key decision-makers for the major producers had personal access to each other both directly and indirectly.

130.     Many of the Defendants are either Japanese corporations or partially or wholly owned U.S. subsidiaries of Japanese corporations. The geographic proximity of the Japan-based Defendants to each other help facilitate their ability to meet, converse, agree on a course of collusive action and execute on that course of action on a real-time basis. Many of the Defendants also manufactured other passive electronic components, including capacitors. These Defendants regularly met with each other to fix prices and exchange confidential non-public information, and engage in cartel activity with respect to

CLASS ACTION COMPLAINT

other passive components. For example, Panasonic conspired in violation of the antitrust laws with capacitor manufacturers, including at times Defendants AVX, Kemet, Rohm, TDK, and Vishay, starting no later than January 1, 2003.

131.    Defendants can procure relatively detailed competitive information from industry analysts. The resistor industry is analyzed by a limited number of market research firms that deal in detailed industry data. Each of these firms offers, for a fee, market data on pricing, supply, and other key indicators of market activity as well as market projections. The capacity and pricing information procured by these analysts is provided directly from industry participants, including certain of Defendants. Given the limited number of analysts that cover the Resistors industry, those that do are often provided highly detailed information and direct access to decision-makers for the Resistors manufacturers, including Defendants.

132.    In fact, Defendants engaged in regular and continuous exchanges of confidential information regarding their respective Resistors businesses throughout the Class Period.

## IX.    CURRENT U.S. AND INTERNATIONAL ANTITRUST INVESTIGATIONS INTO ANTICOMPETITIVE PRACTICES IN THE RESISTORS INDUSTRY

133.    Defendants' conspiracy to artificially raise, maintain or stabilize prices for Resistors has only recently been discovered by law enforcement and regulatory authorities in the United States.

134.    In the summer of 2015, media sources reported that Panasonic disclosed details of the Resistors conspiracy to the DOJ Antitrust Division as part of its ACPERA leniency request.

135.    Defendant Panasonic/SANYO has approached U.S. authorities to self-report its involvement in the conspiracy and to request prosecutorial leniency and amnesty.

136.    ACPERA provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily admits its conduct to the DOJ. A November 19, 2008 presentation on the DOJ's website explains that "[a conditional leniency] applicant must admit its participation in a criminal antitrust violation involving price fixing . . . before it will receive a conditional leniency letter." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that the applicant is not charged with a criminal offense and is not required to plead guilty to criminal charges.

137.     By applying for leniency through ACPERA, for this or another conspiracy, Panasonic/SANYO would have had to admit to price fixing in the Resistors industry.

138.     Additionally, it is reported that the Korean Fair Trade Commission ("KFTC") recently conducted an on-site investigation of suspected price fixing in the market for Resistors. It is also reported that the Japanese Fair Trade Commission ("JFTC") conducted raids at some of the Defendants' offices.

139.     On information and belief, the information concerning this conspiracy came to light as part of the DOJ's investigation into price-fixing in the capacitors industry.

140.     Panasonic and SANYO—both before and after Panasonic's acquisition of SANYO—have been investigated by the DOJ in the last several years for participating in price-fixing conspiracies involving automotive parts and lithium ion battery cells.

141.     SANYO agreed to plead guilty for its role in a year and a half long conspiracy to fix prices on cylindrical lithium ion battery cells sold worldwide for use in notebook computer battery packs, and agreed to pay a $10.731 million criminal fine.

142.     Panasonic pled guilty for its role in a nearly six and a half year-long conspiracy to fix prices of switches, steering angle sensors, and automotive high intensity discharge ballasts installed in cars sold in the United States and elsewhere. Panasonic agreed to pay a $45.8 million criminal fine, and a number of its executives pled guilty in exchange for limited fines and imprisonment.

143.     Additionally, Panasonic has been named as a defendant by the EC Competition Authority in an investigation into CRT televisions and monitors. In related U.S. civil litigation regarding price fixing of CRT televisions and monitors, Panasonic agreed to pay $17.3 million to settle claims brought by direct purchasers. Panasonic is also a defendant in U.S. civil litigation regarding price fixing among TFT-LCD flat panel display manufacturers.

## X.     FRAUDULENT CONCEALMENT

144.     Plaintiff has had neither actual nor constructive knowledge of the pertinent facts constituting its claims for relief asserted herein, despite its diligence in trying to discover such facts. Plaintiff and members of the Direct Purchaser Class could not have discovered through the exercise of

reasonable diligence the existence of the conspiracy alleged herein until in or about July 2015, when investigations by the DOJ were first made public.

145.     Defendants engaged in a self-concealing conspiracy that did not give rise to facts that would put Plaintiffs or the Direct Purchaser Class on inquiry notice that there was a conspiracy among Defendants to artificially fix, raise, maintain or stabilize prices for Resistors, as well as to restrict their respective output by quoting unjustifiably long production lead times. In fact, Defendants had secret discussions about price and output and, in furtherance of the conspiracy, they agreed not to discuss publicly the nature of the scheme. Further Defendants provided pretextual explanations for price changes or pricing decisions.

## XI.     EFFECTS OF DEFENDANTS' CONSPIRACY ON U.S. SALES OF RESISTORS AND INJURY TO THE DIRECT PURCHASER CLASS

146.     Defendants' combination and conspiracy as set forth herein has had the following effects, among others:

a.     Restraint on price competition among Defendants in the sale of their respective Resistors during the Class Period to United States purchasers;

b.     Prices for Resistors sold by Defendants during the Class Period to United States purchasers have been raised, fixed, maintained, and stabilized at artificial and non-competitive levels;

c.     The supply of Defendants' Resistors available for sale during the Class Period to United States purchasers has been artificially and unjustifiably restrained; and

d.     United States purchasers have been deprived of the benefit of free and open competition on the basis of price in the market for Resistors.

147.     As a direct and proximate result of Defendants' anticompetitive and unlawful conduct, Plaintiff and the Direct Purchaser Class have been injured in their business and property in that, during the Class Period, they paid artificially inflated prices for the Resistors they purchased directly from Defendants.

148.     Plaintiff and the Direct Purchaser Class have been damaged as measured by the full amount of the overcharges that they paid in an amount subject to proof and to be determined at trial.

149.   The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## XII.   CLAIM FOR RELIEF

### RESTRAINT OF TRADE IN VIOLATION OF
### THE SHERMAN ACT § 1
### 15 U.S.C. § 1
### (Alleged against all Defendants)

150.   Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

151.   This claim is pleaded as to all Defendants.

152.   Beginning at least as early as January 1, 2003, the exact date being unknown to Plaintiff and the Direct Purchaser Class and exclusively within the knowledge of Defendants, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of Resistors directly sold to United States purchasers.

153.   In particular, Defendants formed a cartel and have combined and conspired to raise, fix, maintain or stabilize the prices of Resistors sold to United States purchasers during the Class Period.

154.   Additionally, Defendants formed a cartel and have combined and conspired to set artificial and unjustified production lead times to limit available supply of Resistors sold to United States purchasers during the Class Period.

155.   As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices for Resistors sold to purchasers in the United States during the Class Period were raised, fixed, maintained or stabilized at artificially inflated cartel levels.

156.   The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

157.   For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

a.      Participating in meetings and conversations to discuss their respective prices and supply of Resistors and how they could effectively coordinate their actions to restrain trade for these products;

b.      Communicating in writing and orally to raise, fix, maintain or stabilize prices for Resistors, and to quote artificial and unjustified production lead times to limit available supply of these Resistors;

c.      Agreeing to coordinate and manipulate the prices and available supply of these Resistors directly sold to United States purchasers in a manner that deprived these purchasers of free and open price competition;

d.      Issuing or signaling to each other price announcements, price quotations and production lead times for specific Resistors in accordance with the agreements Defendants reached among themselves;

e.      Selling Resistors to United States purchasers at noncompetitive and artificial prices Defendants collusively determined; and

f.      Providing pretextual justifications to purchasers and the public to explain any raises, maintenance, or stabilization of the prices for Defendants' Resistors.

158.    Defendants' anticompetitive and unlawful conduct is illegal per se.

159.    As a result of Defendants' anticompetitive and unlawful conduct, Plaintiff and the members of the Direct Purchaser Class have been injured in their businesses and property in that they have paid more for the Resistors that they purchased during the Class Period than they otherwise would have paid in the absence of Defendants' conduct.

## XIII.   DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Direct Purchaser Class defined herein, by adjudging and decreeing that:

A.      This action may proceed as a class action, with Plaintiff serving as a Direct Purchaser Class Representative under Fed. R. Civ. P. 23(c);

B.      Defendants have combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiff and the Direct Purchaser Class have been injured in their business and property as a result of Defendants' violations;

C.      Plaintiff and the Direct Purchaser Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiff and the Direct Purchaser Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15;

D.      Plaintiff and the Direct Purchaser Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

E.      Plaintiff and the Direct Purchaser Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

> 1.  A judicial determination declaring the rights of Plaintiff and the Direct Purchaser Class, and the corresponding responsibilities of Defendants; and
>
> 2.  Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements alleged herein;

F.      Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Direct Purchaser Class;

CLASS ACTION COMPLAINT

G.      Plaintiff and the Direct Purchaser Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.      Plaintiff and the Direct Purchaser Class receive such other or further relief as may be just and proper.

CLASS ACTION COMPLAINT

1

## JURY TRIAL DEMANDED

2    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the

3 claims asserted in this complaint so triable.

4 Dated:  August 24, 2015                       JOSEPH SAVERI LAW FIRM, INC.

5
                                               By:      /s/ Joseph R. Saveri
6                                                       Joseph R. Saveri

7                                              Joseph R. Saveri (State Bar No. 130064)
                                               Andrew M. Purdy (State Bar No. 261912)
8                                              Matthew S. Weiler (State Bar No. 236052)
                                               James G. Dallal (State Bar No. 277826)
9                                              Ryan J. McEwan (State Bar No. 285595)
                                               505 Montgomery Street, Suite 625
10                                             San Francisco, CA 94111
                                               Telephone:     (415) 500-6800
11                                             Facsimile:     (415) 395-9940

12

13

14                                             CERA LLP

15
                                               By:      /s/ Solomon B. Cera
16                                                      Solomon B. Cera

17                                             Solomon B. Cera (State Bar No. 99467)
                                               C. Andrew Dirksen (State Bar No. 197378)
18                                             595 Market Street, Suite 2300
                                               San Francisco, CA 94105
19                                             Telephone:     (415) 777-2230
                                               Facsimile:     (415) 777-5189
20                                             Email:         scera@gbcslaw.com
                                                              cdirksen@gbcslaw.com
21

22                                             *Attorneys for Individual and Representative Plaintiff*
                                               *Chip-Tech, Ltd.*
23

24

25

26

27

28

CLASS ACTION COMPLAINT